1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          16 CR 747 (AKH)

5   ZIMMIAN TABB,

6               Defendant.

7   ------------------------------x

8                                      New York, N.Y.
                                       April 4, 2017
9                                      12:30 p.m.

10

    Before:
11
                    HON. ALVIN K. HELLERSTEIN,
12
                                        District Judge
13

14                      APPEARANCES

15  JOON H. KIM
        Acting United States Attorney for the
16      Southern District of New York
    DAVID DENTON, JR.
17      Assistant United States Attorney

18  RICHARD E. SIGNORELLI
        Attorney for Defendant
19

20

21

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3    appearances for the record.

4          MR. DENTON:  Good afternoon, your Honor.  David Denton

5    for the government.

6          THE COURT:  Good afternoon.

7          MR. SIGNORELLI:  Good afternoon, Judge.  Richard

8    Signorelli.  With me is my client, Mr. Tabb.

9          THE COURT:  Good afternoon, Mr. Signorelli.

10         Good afternoon, Mr. Tabb.  You may be seated.

11         The defendant has made a motion for various relief.

12   I'll hear you on that, Mr. Signorelli.

13         MR. SIGNORELLI:  Thank you, Judge.

14         We have filed both many moving papers and reply

15   papers.

16         THE COURT:  I've read all the papers.

17         MR. SIGNORELLI:  Then I'll keep my remarks as brief as

18   possible.

19         THE COURT:  You can argue to whatever extent you think

20   you need to argue.

21         MR. SIGNORELLI:  Thank you for that opportunity,

22   Judge.

23         First with regard to the severance issue, as I

24   detailed in the papers, there are two separate grounds for the

25   severance of the counts.  The first ground pursuant to

1    Rule 8(a) is the fact that even though he's charged with three

2    narcotics offenses, there are actually two separate schemes.

3         You have the vehicle scheme, if I may call it that,

4    and the apartment scheme.  There are essential differences

5    between those two as I outline in our papers -- different

6    packaging, different drugs, different quantities, different

7    locations, etc.  For those reasons alone, similar to some of

8    the cases I cite, bank robberies, for example, they should be

9    separated.

10        In addition and independently, there is also

11   significant prejudice.  It is our contention, respectfully,

12   that each of the schemes should stand on their own before a

13   judge and jury with regard to the evidence with regard to the

14   government's burden to prove beyond a reasonable doubt each

15   scheme standing alone.

16        If the jury hears evidence relating to both these

17   schemes -- and there's not a lot of evidence that we're aware

18   of, at least at this time -- then there is a very real risk of

19   significant prejudice, of spillover prejudice, with regard to

20   the jury being prejudiced by evidence relating to one scheme

21   versus the other.

22        I think it's especially significant here because of

23   the relatively smaller amount of evidence that's typically

24   available in these cases.  First of all, we would request a

25   severance of Count One.

 1                THE COURT:  Let's argue each part separately.

 2                MR. SIGNORELLI:  Of course, your Honor.

 3                THE COURT:  So, when you're finished with the

 4      severance argument, I'll hear Mr. Denton.

 5                MR. SIGNORELLI:  Other than what I've just said, we

 6      rest on our papers with regard to the severance argument.

 7      Thank you.

 8                THE COURT:  I haven't read the complaint.  Is there an

 9      allegation in the complaint of the date that the officers

10      inspected the apartment?

11                MR. SIGNORELLI:  Yes.  It's August 24, 2016.

12                THE COURT:  That's in Count Three.

13                MR. SIGNORELLI:  And Two.

14                THE COURT:  With regard to Count Two, the automobile

15      search, was it the same day?

16                MR. SIGNORELLI:  The automobile search I believe is

17      Count One.  That would be August 13.  It's an 11-day time

18      difference.

19                THE COURT:  Let me ask Mr. Denton.

20                What are the acts that are actionable in each of the

21      three counts?

22                MR. DENTON:  Your Honor, so with respect to Count One,

23      it's the defendant's alleged possession of crack cocaine in the

24      vehicle that he was operating -- it was registered to his

25      girlfriend -- on August 13.

1          With respect to Count Two, it was the defendant's

2     possession of certain quantities, in some respects, trace

3     quantities of narcotics, that were found in his residence which

4     he shared with the same girlfriend on or about August 24.

5     Obviously, the government's position is that was a continuing

6     offense; that that's the date of discovery, not necessarily the

7     sole date of commission.

8          THE COURT:  When you say "trace," what do you mean by

9     that?  Trace elements.

10          MR. DENTON:  Your Honor, there were scales that were

11     recovered from the apartment that were tested that the

12     New York City Police Department lab identified detectable

13     quantities of controlled substances.  So it's simply charged as

14     a detectable quantity.

15          THE COURT:  Is there any relationship with the crack

16     in the auto?

17          MR. DENTON:  We believe that there is in that one of

18     the scales tested positive for cocaine.

19          THE COURT:  There were traceable elements of cocaine

20     on the scale?

21          MR. DENTON:  Yes, your Honor.

22          THE COURT:  There were a number of bags of cocaine

23     found, crack cocaine, found in the car on August 13 in a false

24     compartment.  Right?

25          MR. DENTON:  Yes, your Honor.  It wasn't a false

1    compartment.  It was sort of a naturally existing space where

2    there's a door on the side of the car that let's you get to the

3    gas cap.  It wasn't the sort of hidden compartment we commonly

4    consider a trap.

5         THE COURT:  So part of your proof would be that this

6    defendant was cooking crack, storing drugs, and the like in the

7    apartment.  And that connects with the drugs found in the car?

8         MR. DENTON:  Yes, your Honor.  I don't know whether we

9    would allege specifically that he was manufacturing the crack

10   cocaine as opposed to simply storing or preparing it for

11   distribution.  But in sum and substance, that's correct.

12        THE COURT:  The sales were part of the packaging?

13        MR. DENTON:  Yes, your Honor.

14        THE COURT:  What does Count Three allege?

15        MR. DENTON:  Count Three alleges that the defendant

16   used the apartment that was his residence as "a stash house" or

17   a location where narcotics were packaged and prepared for

18   distribution.

19        THE COURT:  Mr. Signorelli, what counts do you want to

20   sever from which counts?

21        MR. SIGNORELLI:  We ask for the severance of Count

22   One, which is the vehicle-related count, from Counts Two and

23   Three, which are the apartment-related counts.

24        There's no evidence that the apartment was in any way

25   used for the storage, possession, or distribution of crack

1    cocaine in that no crack cocaine was found in the apartment.

2    There were no crack cocaine baggies similar to the baggies

3    found in the vehicle.

4        We really do believe that they stand apart from one

5    another, completely different and very low-level narcotics

6    offenses.  There really isn't any connection between the two,

7    other than speculation on the government's part, and it really

8    is speculation.

9        THE COURT:  I think I can rule on this issue now.

10    There are liberal standards for joinder of offenses, the

11    United States against Wilson, 512 F. App'x 75 and 76, Second

12    Circuit 2013.  Although I shouldn't cite a summary decision

13    from the Court of appeals as a precedent, the rule is so

14    generally known that any number of cases could be cited.

15        Federal Rules of Criminal Procedure Rule 8(a) provides

16    that two or more offenses may be joined in a single indictment

17    if the offenses charged are the same or similar character or

18    based on the same act or transaction or connected with or

19    constitute parts of a common scheme or plan.

20        Here we have the defendant and his girlfriend involved

21    in the possession violation in the car and in the apartment.

22    The dates, although separated by a few days, are really very

23    close together.

24        What happened in the apartment on August 24 is not

25    something new.  It connects back to what happened in the car on

1    August 13.  So I think there's sufficient similarity to provide

2    for the joinder of pleadings.

3            As to the issue of prejudice, I need to be careful

4    that the evidence on both does not suggest some habit of the

5    defendant that would be otherwise impermissible, but I will

6    entertain appropriate instructions from defense counsel to

7    avoid the issue of prejudice.

8            So I don't think there will be prejudice at this

9    stage.  If the case proceeds and evidence shows that there will

10   be prejudice, a renewal of the motion can be made.  I don't

11   think it will be necessary.  So that part of the motion is

12   denied.

13           The next part would be a suppression of evidence.

14           Go ahead, Mr. Signorelli.

15           MR. SIGNORELLI:  Thank you, Judge.  There are several

16   subparts to the suppression of evidence.  I'll take each one in

17   the same order as they appear in the reply papers.

18           First an overview.  There are essentially five

19   separate searches that are involved in this case.  Two were

20   executed pursuant to a search warrant.  Three were warrantless

21   searches.

22           With regard to the vehicle, number one, there were

23   three searches of the vehicle.  The first two were warrantless.

24   The third was with a warrant.  With regard to the very first

25   search which happened at the time of the stop of the vehicle 45

1    minutes after the 911 callers had reported a shooting in the

2    area, the police officers conducted a warrantless search of two

3    occupants of the car, including my client, and Nydrique Jones.

4          They found nothing on their person relating to guns or

5    narcotics, and they found nothing in the vehicle, in the

6    interior of the vehicle within reach of the two occupants.

7          We are not contesting at this time the lawfulness of

8    that very first search, given the nature of the 911 calls, etc.

9    It is the second warrantless search that is, to say the least,

10   hotly contested in this case, your Honor.

11         We are contending, with a great deal of evidence, that

12   the second warrantless search, which the government has

13   described as an inventory search, was totally illegal for two

14   reasons:

15         First, the arrest of my client was illegal.  It should

16   not have happened.  It was that arrest which led to the police

17   bringing, seizing, impounding, and searching the vehicle at the

18   precinct without a warrant.

19         The police have primarily justified the arrest of my

20   client on the ground that at that time he had known bench

21   warrants, outstanding warrants of arrest against him.  They say

22   the same thing about Nydrique Jones.  The government has

23   forcefully alleged that issue.

24         We have presented to this Court with overwhelming

25   documentary evidence in the form of Core Alerts, fingerprint

1    summaries, hearsay statements from their state lawyers, and

2    they're willing to do a first-hand account if necessary.  I

3    don't think it is in this case.  It all says the same thing,

4    this overwhelming, extremely reliable evidence.

5          Contrary to the police statements to the government

6    and in this court in the criminal complaint, though there is no

7    other support evidence -- and I would emphasize that point --

8    there were no known arrest warrants for Mr. Tabb and also the

9    same can be said for Mr. Jones.  That's very, very important.

10          Now, the government has brought up an arrest warrant

11   from a 2005 summons for having an open container of alcohol,

12   and they say that this is the evidence that there was a known

13   warrant out for my client's arrest at the time of the stop.

14          On the contrary.  There is no evidence whatsoever,

15   including no sworn evidence from any police officer, that they

16   knew about that particular warrant at the time of the stop.

17   Indeed, the documentary evidence indicates that they couldn't

18   have known.

19          The fact that they might have gone through court files

20   after the fact to justify this after the fact doesn't save them

21   from the illegal arrest that was effected of my client.  The

22   same argument again for Mr. Jones and the three summonses.

23          In fact, the only document the government presents to

24   support the police officers' false account -- I don't say that

25   lightly or allege that lightly -- is a document I've never seen

 1    before in my practice.  Nor have the state attorneys that I

 2    consulted who have represented Mr. Tabb and Mr. Jones in the

 3    state court proceeding.  That's called a DAS snapshot.  Their

 4    are own document doesn't support their theory.

 5         There is no outstanding warrant listed for the

 6    particular summons they say support the arrest of Tabb and

 7    Jones that evening.  All it lists is these very old cases.

 8         THE COURT:  The sequence was the 911 call, the

 9    identification of the defendant and the car.  Then what

10    happened?

11         MR. SIGNORELLI:  It wasn't so much an identification

12    of the defendant.  They identified a shooter having completely

13    different clothing and different skin tone or color as my

14    client.  My client was not identified as the shooter at all.

15    The opposite is the case.

16         They reported a shooting in the area.  They also

17    connected that shooting to the BMW vehicle.  Forty-five minutes

18    later, the police stopped the car.  They find no firearms in

19    the interior of the car, no firearms on the person of Mr. Tabb

20    and the occupant of the car, Mr. Jones.  They then proceed --

21         THE COURT:  But they were looking.

22         MR. SIGNORELLI:  They looked thoroughly.

23         THE COURT:  Did they arrest the two?

24         MR. SIGNORELLI:  They did.  They arrested the two

25    after they found nothing.

1          THE COURT:  They did the search at a precinct house;

2     right?

3          MR. SIGNORELLI:  That's right.

4          THE COURT:  So they identified the car, and I guess

5     the occupants were then told to drive the car to the precinct

6     house?  What happened?

7          MR. SIGNORELLI:  According to the police -- we

8     respectfully disagree with that account -- we think it's not

9     true -- they say that with regard to Tabb and Jones, there are

10    outstanding warrants for their arrest.  That's what they say at

11    that time, which is 4:30 in the morning on August 13.

12         THE COURT:  That's what they used to justify taking --

13         MR. SIGNORELLI:  That was their primary justification.

14    They also said my client didn't have a driver's license.  They

15    leave out the fact that he had a legitimate driver's permit.

16    He was with a licensed driver.  Normally and ordinarily, that

17    is a ticket, not an arrest that takes place, if there's no

18    other accompanying violation of the law.

19         THE COURT:  If there's a violation, the police can do

20    anything, a ticket or summons or arrest.

21         MR. SIGNORELLI:  The important thing is they found no

22    firearms, and the primary --

23         THE COURT:  The search for firearms uncovered the

24    crack.

25         MR. SIGNORELLI:  It was the second search, the

1    so-called "inventory search" at the precinct after the arrest

2    of Mr. Tabb and Mr. Jones and after the car --

3             THE COURT:  First there has to be a lawful arrest.

4    Without a lawful arrest, there can't be a lawful search.

5             Is that right, Mr. Denton?

6             MR. DENTON:  That is correct.  Separate and apart from

7    the argument that the government makes that the officers were

8    entitled to search the vehicle.

9             THE COURT:  As a matter of law, you don't have a right

10   to search a car unless there's special reason to do so:  A, an

11   arrest; B, a warrant; C, I guess a violation or a suspicion of

12   a violation of supervised release.

13             MR. DENTON:  The only quarrel I would take with

14   your Honor's categories is that under the automobile exception,

15   a warrant is not required.  Only probable cause to search the

16   vehicle.

17             THE COURT:  That follows an arrest usually.

18             MR. DENTON:  It certainly can, yes, to the extent

19   there is a valid arrest and seizure of a vehicle.

20             THE COURT:  The car is not suspected of shooting

21   anybody.  The whole suspicion is because there were shots fired

22   and the 911 call identified a black male wearing a gray T-shirt

23   and gray shorts and shots being fired in the vicinity of 216th

24   Street and White Plains Road in the Bronx.  Also they

25   identified that the black male with the firearm had been

1  driving a white BMW with a specified license plate.  So the car

2  is identified.

3          What's the next thing that happens in a nearby area,

4  217th Street and Bronxwood Avenue?  They stop the vehicle.

5  They identify the defendant in the driver's seat and another

6  male black individual in the front passenger seat as persons

7  fitting the description.

8          What's the next thing that happened?

9          MR. DENTON:  At that point, your Honor, essentially a

10  security pat-down was done with respect to both defendants.

11  The officers queried information from the NYPD about their

12  names and pedigree information and identified that both

13  individuals had outstanding warrants for their arrest.

14          They were placed under arrest, and the vehicle was

15  brought back to the precinct.

16          THE COURT:  So that's the arrest.  The arrest is then

17  the basis for the search of the car.

18          MR. DENTON:  Yes.

19          THE COURT:  Mr. Signorelli said that arrest was

20  invalid.

21          Right, Mr. Signorelli?

22          MR. SIGNORELLI:  That's correct, your Honor.

23          THE COURT:  Why was it invalid?  Because the

24  police officers identified the car and, when calling it in,

25  were told that there were active arrest warrants.  They can act

1   on that; right?

2          MR. SIGNORELLI:  We think it's a lie from the police.

3          THE COURT:  Which?

4          MR. SIGNORELLI:  The fact that they're saying there

5   are active arrest warrants.  To the extent that the only

6   evidence before --

7          THE COURT:  The police who said that we can arrest

8   these fellows because there were active arrest warrants were

9   lying?

10          MR. SIGNORELLI:  We do believe that's a falsehood.  I

11   don't make that accusation lightly.  I make it on the basis of

12   the only evidence before your Honor indicates no arrest

13   warrants, no outstanding warrants.  This is compelling

14   documentary evidence that --

15          THE COURT:  If those arrest warrants were not actually

16   outstanding.

17          MR. SIGNORELLI:  Indeed even worse we believe.  A

18   hearing will --

19          THE COURT:  Two things.  Were they actually

20   outstanding?  Were there arrest warrants actually outstanding?

21          MR. SIGNORELLI:  I believe that is an open question,

22   with regard to Mr. Tabb anyway, because, as I indicate in the

23   reply papers, there are real validity problems with that arrest

24   warrant from 2005.  I cite a list --

25          THE COURT:  Whether it was a valid warrant or an

 1    invalid warrant, was it outstanding?

 2              MR. SIGNORELLI:  We don't believe it was.  More to the

 3    point --

 4              THE COURT:  Mr. Denton, was there one outstanding?

 5              MR. DENTON:  Yes, your Honor.  The government has

 6    produced a warrant and a Bronx court docket showing that the

 7    warrant was outstanding.

 8              THE COURT:  Why is that a false document?

 9              MR. SIGNORELLI:  As I detail in the papers, first of

10    all, the warrant they produced has numerous errors on it.

11    First of all, the date of birth is 2015.  The name is wrong.

12    The first name is wrong.  There are five or six other errors

13    with that warrant.

14              THE COURT:  You want to examine the arresting

15    policeman to see if he spoke a lie when he said, I called, and

16    I was told there was a valid warrant?

17              MR. SIGNORELLI:  That's right.  That is the essential

18    issue.  It's not whether there was some warrant in some old

19    court docket which the police and the government are now

20    claiming justified this arrest after the fact.  It's the old

21    Watergate saying, what did they know, and when did they know

22    it.

23              At 4:30 in the morning, our compelling evidence shows

24    that they could not have known about this warrant because the

25    alert summary sheet, which we attach as an exhibit to our

1   papers, the fingerprint summary sheet, which we attach to our

2   papers, indicates zero warrants for both Mr. Tabb and

3   Mr. Jones.

4           THE COURT:  Mr. Denton, is there any basis outside of

5   the warrant to justify the in-camera inspection of the car?

6           MR. DENTON:  Yes, your Honor.  We believe that the

7   specificity of the 911 call identifying the vehicle gave the

8   police probable cause to believe that evidence would be found

9   in it.

10          THE COURT:  It seems to me from hearing you I need to

11  have an evidentiary hearing.

12          MR. DENTON:  Your Honor, if I may, I would like to

13  correct a couple of things that Mr. Signorelli has said and

14  address whether a hearing is necessary here.

15          I would note a couple of different things.  First of

16  all, Mr. Signorelli raises this argument in his reply brief,

17  which the government did not have an opportunity to respond to,

18  that the critical question is not whether there was a valid

19  warrant but whether the officers knew.

20          If your Honor believes that that's a relevant

21  question, the government will be happy to provide supplemental

22  briefing, but the Supreme Court has expressly rejected

23  Mr. Signorelli argument in Utah v. Strieff --

24          THE COURT:  If the arresting officer reasonably and

25  honestly believes that there was an outstanding arrest warrant,

 1    he can go ahead and effect the arrest.  That's that case, isn't

 2    it?

 3           MR. DENTON:  No, your Honor.  That's herring.  That's

 4    a different question.  In Utah v. Strieff, which was decided

 5    last term, the Supreme Court held that where the police

 6    unlawfully detained an individual and then later discovered

 7    that there is a valid arrest warrant for him, what they knew at

 8    the time of the detention has no bearing on the suppression

 9    because if there is a valid basis for the arrest, the arrest

10    was legal ab initio.  So the question of what --

11           THE COURT:  Do you take issue with that,

12    Mr. Signorelli?

13           MR. SIGNORELLI:  We don't believe the arrest was legal

14    at all because they're basing the arrest on the fact that they

15    say there's an outstanding warrant --

16           THE COURT:  And this outstanding warrant that

17    Mr. Denton has produced you don't count as a valid warrant?

18           MR. SIGNORELLI:  We think there are real questions

19    about its validity.  It's not even certified.  It's not even

20    stamped.  It has different information.

21           THE COURT:  What's the exhibit?

22           MR. DENTON:  It's Government Exhibit B, your Honor.

23           THE COURT:  B as in boy?

24           MR. DENTON:  Yes, your Honor.

25           MR. SIGNORELLI:  When your Honor is ready, I'd like to

```
 1    go through the list of errors in that warrant.

 2                THE COURT:  Go ahead.  I'm ready.

 3                MR. SIGNORELLI:  First Mr. Tabb's first name is

 4    misspelled as Z-i-m-a-n.  Second his date of birth on this

 5    warrant is listed --

 6                THE COURT:  Excuse me.  It says Z-i-m-m-i-a-n, the

 7    People of the State of New York v. Zimmian Tabb.

 8                MR. SIGNORELLI:  It's Exhibit B, your Honor, of the

 9    government's papers.

10                THE COURT:  It starts out, Police Officer Austin

11    Hieronymi.

12                MR. DENTON:  Your Honor, I think that may be

13    Mr. Signorelli exhibit.  I'm not sure he actually attached the

14    warrant.

15                MR. SIGNORELLI:  I'm actually referring to the exhibit

16    the government attached.

17                THE COURT:  I was looking at your exhibit.

18                MR. SIGNORELLI:  I didn't want to overburden the

19    Court.

20                THE COURT:  I have that.  The warrant of arrest on

21    Ziman Tabb.

22                MR. SIGNORELLI:  If I may proceed, your Honor.

23                THE COURT:  So Ziman Tabb is a different person than

24    Zimmian Tabb.

25                MR. SIGNORELLI:  Even worse than that.  His date of
```

1    birth is listed as 1-1-0001, which is not a date of birth.  His

2    age is listed as 2015, which is not his age.  Third, his race

3    is indicated as unknown.  Fourth, there's no other descriptive

4    information.  That's all laid out there.

5         Fifth, and most telling of all perhaps, there's a fax

6    notation at the top of this document which tells me that the

7    police first discovered this warrant at the government's

8    request in November of 2016, two or three months after the stop

9    and in response to the government's queries because the defense

10   found this allegation of an open arrest warrant.

11        THE COURT:  Mr. Denton, I don't feel comfortable

12   relying on a document where there are those discrepancies.

13        MR. DENTON:  Your Honor, I don't think that that is

14   accurate.  I think if you look at Government Exhibit A, you'll

15   see the summons which, unless Mr. Signorelli is contending that

16   that summons was not issued to Mr. Tabb, Government Exhibit A

17   contains sort of similar errors, but it explains why the

18   warrant may be flawed.

19        It contains the same address.  It's omitting his date

20   of birth.  This is the underlying summons.  So the information

21   there completely tracks the information on the warrant,

22   including that address, which is an address that Mr. Tabb has

23   provided in the past.

24        THE COURT:  What does this summons mean?

25        MR. DENTON:  This is the underlying violation that was

1   the basis for the issuance of the warrant when the defendant

2   failed to appear.

3            THE COURT:  This led to the warrant in Exhibit B?

4            MR. DENTON:  That's correct.

5            THE COURT:  So this was outstanding?

6            MR. DENTON:  Yes, your Honor.

7            THE COURT:  Under the Supreme Court case you cite,

8   this existing warrant justified the arrest?

9            MR. DENTON:  That's correct.

10           MR. SIGNORELLI:  We disagree, your Honor.

11           THE COURT:  I know you disagree.  I rule in favor of

12  the government.

13           MR. SIGNORELLI:  No hearing on this?

14           THE COURT:  I don't think you need a hearing.

15  Discrepancies are irrelevant.

16           What other information do you have to justify the

17  in-camera inspection of the car?

18           MR. DENTON:  Well, your Honor, once the arrest was

19  validly effected, we think that the officers were entitled to

20  perform an inventory search on the car.

21           THE COURT:  Let's say I don't think this.  The basis

22  of the arrest was also the description.  And what else?

23           MR. DENTON:  The basis for the arrest was the arrest

24  warrant, your Honor.  We're not taking the position that --

25           THE COURT:  So this document, A and B.

 1             MR. DENTON:  Yes, your Honor, together with C, which

 2   is the court document showing that this was in fact unanswered

 3   essentially as of the date of the arrest.  So it was still a

 4   pending warrant.

 5             MR. SIGNORELLI:  Your Honor, if I could just say

 6   something with regard to this arrest warrant.  I've hardly ever

 7   asked a court to reconsider something.  I move on.  In this

 8   case, if I may be given a brief opportunity.

 9             THE COURT:  Go ahead.

10             MR. SIGNORELLI:  There is no evidence that the

11   police officers relied on this warrant at the time --

12             THE COURT:  There doesn't have to be.  The

13   Supreme Court rule says it doesn't have to be relied upon.

14   It's in effect ex post facto, that which exists, even though

15   you didn't know it, justifies.

16             MR. SIGNORELLI:  There's another problem with this

17   arrest warrant.  I list this in my reply papers.  There's no

18   indication it is a legitimate arrest warrant certified by the

19   clerk of the court.  There's no indication at all that this is

20   a legitimate arrest warrant which the police officers relied

21   upon.

22             THE COURT:  All you've seen is a photo; right?

23             MR. SIGNORELLI:  We have other photos for the Nydrique

24   Jones arrest warrant which we attach as exhibits.  You can

25   clearly see the clerk's stamp, and there is no stamp, at least

1    on the copy that we have here.

2          THE COURT:  I think if you want to prove this existed,

3    Mr. Denton, you have to prove it properly.

4          MR. DENTON:  Your Honor, we can attempt to obtain a

5    certified copy and provide it to the Court and, if necessary,

6    provide a copy for Mr. Signorelli in-camera inspection.

7          THE COURT:  I think if you provide it for

8    Mr. Signorelli in-camera inspection, that should suffice.  If

9    he continues to challenge it as a valid court document, it

10   would have to be brought to my attention.  I'm ruling on the

11   basis that this is a valid document, but you've got to prove

12   that.

13         MR. DENTON:  Yes, your Honor.

14         MR. SIGNORELLI:  There's also another troubling thing

15   about this case, and the government attacks my advocacy.  They

16   say my client returned to court and received an ACD on

17   August 31, 2016, on this very case.

18         THE COURT:  Which case?  The underlying case?

19         MR. SIGNORELLI:  The 2005 summons.  As my client has

20   declared under the penalties of perjury in his reply

21   declaration, he never was in court that day.  So something

22   happened that day.  Some person received an ACD, which is an

23   adjournment in contemplation of dismissal --

24         THE COURT:  Where is the ACD?

25         MR. SIGNORELLI:  The ACD is referred to in

1    Government's Exhibit -- it's in a docket sheet, Government's

2    Exhibit C.  The government has alleged again --

3        THE COURT:  What are you saying?  That this shows that

4    the underlying warrant was not pending at the time of the

5    in-camera inspection because there had been an ACD?

6        MR. SIGNORELLI:  There's something very wrong with the

7    fact that this docket reflects an ACD being received by a

8    defendant, and my client is declaring under the penalties of

9    perjury that he wasn't in court that day to receive an ACD or

10    any other day to receive an ACD.  So there's something very

11    wrong with regard to that.

12        THE COURT:  Let me understand.  He received an ACD.

13    That meant that the underlying warrant was no longer

14    outstanding.

15        MR. SIGNORELLI:  At the end of August 2016.  Whatever

16    happened in court that day with that defendant, it wasn't my

17    client.  It wasn't Mr. Tabb.

18        THE COURT:  So this ACD came after the events alleged

19    in the indictment?

20        MR. SIGNORELLI:  After the stop of the vehicle.

21    Suddenly this --

22        THE COURT:  It's not relevant.

23        MR. SIGNORELLI:  The relevance is --

24        THE COURT:  It's not relevant.

25        MR. SIGNORELLI:  There's a second independent reason,

1    your Honor, with regard to the suppression of the evidence from

2    the warrantless search of the vehicle at the precinct.  That is

3    it was not only an improper arrest, as we allege, but also an

4    improper search; that they went beyond the patrol guide.

5        The patrol guide not only lists several designated

6    areas that are legitimate areas that the police officers may

7    conduct an inventory search, but number two, they say areas

8    that could contain valuable valuables so the police can't be

9    accused of stealing the items and so on and so forth, to avoid

10    lawsuits and things like that.

11        As we contend, we believe that the police officers

12    went well beyond an inventory search and did an investigatory

13    search.  Indeed, in one of their police reports, which I attach

14    as Exhibit N to my main moving papers -- I believe it's N.

15    It's the last exhibit.  It's Exhibit O, the last exhibit of our

16    main moving papers attached to my declaration.

17        The police officers have acknowledged in their police

18    reports that they're conducting an investigatory search, not an

19    inventory search.  I believe that is a very telling admission

20    that they brought that car back, not to do an inventory search

21    for valuables pursuant to the patrol guide, but they did it to

22    search warrantlessly for evidence of a crime.

23        Again, the government has the burden of proof --

24        THE COURT:  They could have performed the inventory

25    search to pick up any contraband that exists.

1          MR. SIGNORELLI:  A proper inventory search would have

2    turned up no contraband.

3          THE COURT:  Is the purpose of an inventory search in

4    part to find and list and keep secure any contraband?

5          MR. SIGNORELLI:  According to the patrol guide and

6    existing case law, the purpose of an inventory search is to

7    search for areas where valuables may be found so that the

8    police officers can't be accused of theft.

9          THE COURT:  Is it also to secure any contraband that

10   may be found?

11         MR. SIGNORELLI:  If it's found through an otherwise

12   legitimate inventory search, of course the police officers can

13   recover contraband, but that begs the question here is a gas

14   tank compartment area on the outside of a car a place where

15   anyone -- we don't have any evidence from the government as

16   to --

17         THE COURT:  I know it's part of what's done in an

18   inventory.  This is a compartment of the car already there.

19   It's not any secret hatch, but people sometimes keep things

20   there.  They can tape it to the side of the car in the gas tank

21   area.  Sometimes searching that entire area is sufficient.  I

22   hold that's not a ground for suppression.

23         MR. SIGNORELLI:  So, your Honor, then our next item on

24   our pretrial motions is the search of the apartment.

25             Now, we believe that there are disputed issues of

1    material fact regarding why that search was conducted, who

2    initiated the search, who organized the search, who organized

3    the search, who asked for the search.  The government contends

4    that it was a legitimate search of someone on supervised

5    release without any sworn evidence.

6         We disagree with that contention.  We believe that the

7    search was conducted for non probation-related objectives.  It

8    was really conducted by the firearms-related law enforcement

9    officers.

10        The problem there is very simple.  They didn't get a

11   warrant to search the home.  This is not the stalking horse

12   theory which the government makes much ado about.  Our

13   contention is very simple.  Regardless of the particular

14   standard that the Second Circuit follows, at the very least,

15   the search must be for probation-related objectives.

16        Without any responsible evidence, testimony from the

17   relevant police officers, it's impossible for the government to

18   contend conclusively and to argue that there were no disputed

19   issues of material fact that this was done for

20   probation-related objectives when we don't know who initiated

21   it, who asked for it, what were the reasons for the search, who

22   organized it, who carried it out.  There's no evidence in the

23   record with regard to any of those important questions that an

24   evidentiary hearing would address.

25        So, for those reasons, as well as all the reasons in

1    the main and reply motion papers, we would ask for an

2    evidentiary hearing on the legitimacy and the lawfulness of

3    still another warrantless search, in this case, the apartment,

4    for those reasons, your Honor.  Thank you.

5            THE COURT:  Mr. Denton.

6            MR. DENTON:  Your Honor, candidly, what.

7    Mr. Signorelli contends are material issues are, by virtue of

8    the controlling case law, which he suggests the Court ignore,

9    immaterial.

10           The Second Circuit has explicitly said that it is

11   immaterial who conducts the search.  As long as probation is

12   there, that it is immaterial who asks for the search, as long

13   as there is a probation objective that is apparent.

14           In Reyes, the Second Circuit said that it is difficult

15   to imagine a situation where a probation officer conducting a

16   home visit in conjunction with law enforcement officers, based

17   on a tip that the probation officer has no reason to believe

18   conveys intentionally false information about a supervisee's

19   illegal activities, would not be pursuing legitimate supervised

20   release objectives.

21           So this is a very straightforward situation.  The

22   police conveyed a tip that the probation officers had no reason

23   to believe was false that the probationer was in possession of

24   narcotics and was suspected of involvement in a shooting.  That

25   is perfectly legitimate as a grounds --

1          THE COURT:  Violations of parole, supervised release,

2    are appropriate bases for searches.

3          MR. DENTON:  Yes, your Honor.

4          THE COURT:  I rule --

5          MR. SIGNORELLI:  Your Honor, if I may just on the

6    Reyes case which the government cites.  Excuse me for

7    interrupting.  If I may.

8          THE COURT:  Go ahead.

9          MR. SIGNORELLI:  Reyes also says that the law permits

10   such cooperation, and that cooperation is between probation

11   officers and other law enforcement officers, as long as the

12   probation officers are pursuing legitimate probation-related

13   objectives.  That is the essential issue here.

14         THE COURT:  The suspicion of a violation of harboring

15   narcotics is a violation of a condition of parole and

16   supervision.  That's a legitimate objective of the probation

17   officer.

18         So I deny this portion of the motion pursuant to the

19   authority of the United States against Reyes, 283 F.3d 446 at

20   page 471, Second Circuit 2002, holding that the stalking horse

21   theory does not exist as a matter of law since the objectives

22   and duties for probation officers and law enforcement personnel

23   are often parallel and frequently intertwined.

24         The next part is a demand for a bill of particulars.

25         MR. SIGNORELLI:  Yes, your Honor.  If I may.

1           THE COURT:  This is a sufficient indictment.  At this

2     point, the defendant is not entitled to have a

3     particularization of the evidence that was used by the

4     government to prove guilt.  The indictment is sufficient notice

5     of the crime.  So this part of the motion is denied.

6           That denies the defendant's motion.

7           What's next, Mr. Denton?

8           MR. DENTON:  Your Honor, I think, barring anything

9     else from defense counsel, we should set a trial date in this

10    matter.

11          MR. SIGNORELLI:  Your Honor, we haven't gotten a

12    legitimate arrest warrant from the government yet.  So what I

13    would suggest is that we have a relatively short period of time

14    to give the government an opportunity of producing a legitimate

15    arrest warrant from the 2005 summons because we don't have one

16    yet.

17          THE COURT:  How much time do you need for that,

18    Mr. Denton?

19          MR. DENTON:  Your Honor, I think if we have two weeks,

20    if there's any reason why the Bronx can't get us one in that

21    time, we'll report to the Court the reasons why.

22          THE COURT:  Okay.

23          MR. SIGNORELLI:  What I would suggest is that a short

24    additional period of time after that so I can discuss the case

25    with my client.  I would suggest that we have a conference

1    before we asked you all trial.  We'll agree to an exclusion of

2    time because there's another issue that I'd like to bring up,

3    an evidentiary issue, if I may, your Honor.

4            THE COURT:  What's the issue?

5            MR. SIGNORELLI:  The issue is the examination of the

6    fingerprint evidence.  The government has written a letter to

7    your Honor.  Your Honor may recall --

8            THE COURT:  I recall.

9            MR. SIGNORELLI:  -- that I asked for fingerprint

10   examination of the drug evidence found in the vehicle because

11   we contend it did not belong to my client.

12           The defense consented to the government's suggestion

13   or request that they have their own police officers, police

14   department, do the fingerprint examination.  We consented to

15   that.  It removes chain of custody problems and so on and

16   so forth.

17           THE COURT:  So the government is not using any

18   fingerprint evidence I gather.  Right, Mr. Denton?

19           MR. DENTON:  That's correct, your Honor.

20           MR. SIGNORELLI:  Even more so, they have indicated

21   that they're not having the police department, barring a court

22   order, examine the narcotics evidence at all for fingerprint

23   evidence.  Now, it is true that plastic is not as good a

24   substance as other materials for fingerprints, but fingerprints

25   can be left on plastic items.

1           THE COURT:  So what do you want?

2           MR. SIGNORELLI:  I want to propose a compromise.

3           THE COURT:  What do you want?

4           MR. SIGNORELLI:  There are 75 bags containing the

5      crack cocaine that were found in the vehicle.  The government

6      says it would take too long for the police department to

7      examine those bags.  They indicate three months.

8           We would like a representative sample of one third, 25

9      of those bags, examined.  If they can't find fingerprints, so

10     be it.  At least a good-faith effort was made because there are

11     important issues in this case.

12          THE COURT:  Are you CJA appointed?

13          MR. SIGNORELLI:  I am, your Honor.

14          THE COURT:  Why don't you ask for an expert?

15          MR. SIGNORELLI:  Well, the government has addressed

16     that too.  I'd be happy to, but they initially offered to have

17     their own police department do it.  In their letter to

18     your Honor, they say that CJA funds should not even be used to

19     do that.  I'd be happy to get an expert.

20          THE COURT:  I don't think it's a proper use of CJA

21     funds, but you're the lawyer.  If you have a reasonable

22     suspicion that there could be fingerprints that would be

23     exonerating, I'll let you do it.  It's not going to hold up the

24     trial.

25          MR. SIGNORELLI:  Unless the government --

1            THE COURT:  A reasonable sample would be 10 percent.

2   There are 75 bags.  Examine 10 of them.

3            MR. SIGNORELLI:  Examine 10?

4            THE COURT:  You can pick them up.

5            MR. SIGNORELLI:  If the government reconsiders its

6   position to have the police department do it, we would consent

7   to that.  I think it would be a lot easier as far as expense

8   and chain of custody.

9            THE COURT:  You're not very trusting of the police

10  department.

11           MR. SIGNORELLI:  The police department laboratory,

12  forensic laboratory.  I don't have any --

13           MR. DENTON:  To be clear, your Honor, I don't think

14  the government will be doing that.

15           THE COURT:  I didn't think you were going to do it.

16           MR. DENTON:  I would also note that we think that

17  while Mr. Signorelli is free to proceed with his expert however

18  he wants, the notion that a partial sample could somehow

19  constitute evidence may be an issue we need to litigate.

20           THE COURT:  What's a partial sample?

21           MR. DENTON:  If he's going to test only some of the

22  bags but not others.

23           THE COURT:  He's looking for someone else's

24  fingerprints.

25           MR. SIGNORELLI:  I'm proposing a compromise.

1          THE COURT:  He's looking for the presence of somebody

2     else's fingerprints.  The chances of finding somebody else's

3     fingerprints are slim on plastic.

4          What else are you looking for?  Are you wanting a

5     conference because you think there's an opportunity to plead?

6          MR. SIGNORELLI:  I would like to -- if and when we

7     receive --

8          THE COURT:  The defendant is entitled to explore the

9     possibility of pleading guilty.

10          MR. SIGNORELLI:  I would like to discuss all options

11     with my client prior to the next conference.

12          THE COURT:  I don't really have objection to having

13     another conference before we set a trial date.

14          MR. SIGNORELLI:  I would suggest a conference within

15     30 days, if that's convenient for your Honor and the

16     government.

17          THE COURT:  Don't ask me then for fingerprints.

18          MR. SIGNORELLI:  If we pursue that, it will be this

19     week, your Honor, with a proposed order.

20          THE COURT:  May 5 at 11:00.

21          MR. SIGNORELLI:  Yes, your Honor.

22          THE COURT:  That will be the date, if nothing else

23     happens, to fix a trial date.

24          MR. SIGNORELLI:  The government's arrest warrant,

25     barring anything unforeseen, within two weeks from now?

1          THE COURT:  Within two weeks.

2          Is there anything else?

3          MR. DENTON:  Not from the government, your Honor.

4          MR. SIGNORELLI:  Nothing further.

5          THE COURT:  We'll see you again May 5 at 11:00.  The

6   government moves to exclude time?

7          MR. DENTON:  Yes, your Honor.

8          THE COURT:  Without objection, so ordered.

9          MR. SIGNORELLI:  Thank you, Judge.

10          THE COURT:  Thank you, folks.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25