*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 18, 2018

**BY ECF AND EMAIL**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States* **v.** *Zimmian Tabb*, **S1 16 Cr. 747 (AKH)**

Dear Judge Hellerstein:

  The Government respectfully submits this letter in connection with the sentencing of defendant Zimmian Tabb, scheduled for January 19, 2018, at 11:00 a.m. For the reasons set forth below, the Government respectfully submits that, in line with the recommendation of the Probation Department, the Court should impose a sentence within the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 151 to 188 months' imprisonment.

## Background

### I. Offense Conduct

  On August 13, 2016, at approximately 4:05 a.m., a 911 caller reported to the NYPD that a black male, wearing a grey t-shirt and grey shorts, had threatened someone with a black gun, and that shots had been fired in the vicinity of 216th Street and White Plains Road. (Presentence Investigation Report ("PSR") ¶ 9). The 911 caller reported that the black male with the firearm had been driving in a white BMW with license plate HAV1839 (the "Vehicle"); that there were multiple male black individuals in the Vehicle; and that after the shots were fired, the Vehicle fled westbound on 217th Street. (*Id*. ¶¶ 9-10).

  Officers responded to the vicinity of 216th Street and White Plains Road in response to the 911 call, and located the Vehicle approximately 45 minutes later, approximately three blocks from the reported location of the shooting. (PSR ¶ 10). Officers initiated a traffic stop of the Vehicle, during which they identified the defendant in the driver's seat and another male black individual (identified in the Complaint as "CC-1") in the front passenger seat. (*Id.*). Officers determined that the defendant and CC-1 each had active arrest warrants, and accordingly placed them under arrest. (*Id.*). Additionally, the defendant did not have a driver's license, and was not the registered owner of the vehicle. (*Id.*). The Vehicle was in fact registered to the defendant's girlfriend, Courtney

Jackson, at her address, 1576 Taylor Avenue, Apartment #4J, Bronx, New York, 10460 (the "Taylor Avenue Address"). (*Id.* ¶ 11).

The defendant and CC-1 were then transported to the 47th Precinct for processing, along with the Vehicle. (PSR ¶ 11). During a routine inventory search of the Vehicle, officers discovered approximately 75 small baggies of a white, rock-like substance from behind the door on the exterior of the vehicle used to access the cap to the gas tank. (*Id.*). The white rock-like substance subsequently tested positive for cocaine base, in a form commonly known as crack cocaine.

At the time of his arrest, the defendant was serving a term of supervised release imposed after his plea of guilty in this district before United States District Judge Paul G. Gardephe to violations of Title 21, United States Code, Section 846 (narcotics conspiracy) and Title 18, United States Code, Section 922(g) (felon in possession of a firearm), in case 12 Cr. 763 (PGG). (PSR ¶ 13). On August 24, 2016, officers from Probation and the NYPD executed a search pursuant to the terms of the defendant's supervised release at the Taylor Avenue Address. (*Id.*). During that search, officers recovered numerous items of narcotics paraphernalia, including plastic baggies, wax paper "glassine" baggies, and several scales in plain view within the apartment. Various of these items subsequently tested positive for narcotics residue, including cocaine and heroin. (*Id.*). The number of baggies of crack recovered from the Vehicle is consistent with the distribution of narcotics; similarly, the glassine baggies and other drug paraphernalia found in Tabb's apartment is consistent with, and indicative of, preparation and packaging of narcotics for distribution. (*Id.* ¶ 14).

## II.     The Charges and Guilty Plea

Based on the forgoing conduct, on September 15, 2016, the defendant was charged in the Complaint with one count of possessing narcotics with the intent to distribute them, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(c), in connection with the narcotics recovered during the inventory search of the defendant's vehicle. On November 9, 2016, the grand jury returned an indictment charging the defendant with one count of the same offense ("Count One"). On February 15, 2017, the grand jury returned the superseding Indictment (the "Indictment"), which additionally charged the defendant with a second count of possessing narcotics with the intent to distribute them, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(c), in connection with the narcotics recovered during the Probation search of the Taylor Avenue Apartment, and with maintaining a place for the purpose of manufacturing, distributing, and using a controlled substance, in violation of Title 21, United States Code, Section 856, in connection with the Taylor Avenue Apartment.

On May 5, 2017, Tabb pled guilty pursuant to a plea agreement to Count One of the Indictment.[1]

---

[1] The defendant claims that he "intentionally allow[ed] a person to place his crack in my car." There is no factual support for Tabb's assertion. Indeed, as discussed *infra*, the drug paraphilia, packaging materials, scales, and baggies found in Tabb's apartment are strongly indicative of the fact that Tabb himself was a narcotics dealer and that the drugs were indeed his. The drugs were

Case 1:16-cr-00747-AKH   Document 55   Filed 01/18/18   Page 3 of 11

Page 3
Case 1:16-cr-00747-AKH   Document 55   Filed 01/18/18   Page 3 of 11

Page 3

### III.     The PSR and the Applicable Guidelines

As set forth in the PSR, the U.S. Probation Office (the "Probation Office") has determined that the applicable Guidelines range for the defendant is 151 to 188 months' imprisonment. *See* PSR ¶ 84. The Government agrees with the Probation Office's calculations.

Pursuant to U.S.S.G. § 2D1.1(c)(13), the base offense level is 16, as the offense involved the possession of more than 2.8 grams but less than 5.6 grams of cocaine base. (PSR ¶ 21). As discussed above, the defendant possessed 75 baggies of crack cocaine in his vehicle. Pursuant to U.S.S.G. § 2D1.1(b)(12), the parties agree that two levels are added because the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance (the "Stash House Enhancement"). (*Id.* ¶ 22). As discussed above, the defendant maintained an apartment that contained baggies, drug paraphilia, scales, and narcotics, which was indicative of drug distribution and manufacture. Pursuant to U.S.S.G. ¶ 4B1.1(b)), the defendant is a career offender and the offense level is 32, because the statutory maximum term of imprisonment is not more than 20 years' imprisonment. (*Id.* ¶ 27). A three-level reduction applies based on the defendant's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a-b). Accordingly, the total offense level is 29.

The defendant has sixteen criminal history points and is accordingly assigned to Criminal History Category VI. (PSR ¶¶ 49-51). Because the defendant is a career offender, he is similarly assigned to Criminal History Category VI. (*Id.*). An offense level of 29 and a Criminal History Category of VI yield an applicable Guidelines range of 151 to 188 months' imprisonment.

The defendant raises three primary objections to the Probation Office's calculations. *First*, the defendant contends that the career offender guidelines do not apply. The Probation Department considered and rejected this precise argument. (PSR at 20). *Second*, the defendant appears to dispute that the Stash House Enhancement applies. (Def Br. 9). Not only does the defendant's argument run contrary to the undisputed facts, but the defendant himself stipulated to the applicability of the Stash House Enhancement in the plea agreement he signed. *Third*, the defendant suggests that he is entitled to a minor-role reduction (the "Minor Role Reduction"), which was not reflected in the parties' plea agreement, and is wholly unsupported by the factual record. (Def. Br. 11). *Finally*, and most importantly, the defendant appears to suggest that he may not have the mental capacity to commit the offense. (Def. Br. 20). For the reasons set forth below, defendant's arguments should be rejected.

Given the new objections raised for the first time by defense counsel in his sentencing submission, prior to proceeding to sentencing, the Court should determine whether defense counsel intends to advance the following arguments in his sentencing submission, which, if advanced, could constitute a motion to withdraw a guilty plea, and/or a breach of the plea agreement:

---

found in Tabb's car, which he drove on numerous occasions, and he was in the driver's seat. There is simply no basis to credit the defendant's self-serving claim that the drugs were not his.

- <u>The Defendant's Intent</u>.  The defense submitted a Forensic Psychological Evaluation which states that the defendant "exhibits significant cognitive and emotional deficits," from which defense counsel argues that the defendant had a "significant diminished capacity with regard to the commission of his offense conduct."  (Def. Br. 20; Def. Ex. A at 12).  To the extent the defendant is arguing that he lacked the intent to commit the offense, such an argument should be considered a motion to withdraw his guilty plea.[2]  The Court should inquire as to whether the defendant intends to proceed with such a motion and argument with respect to the defendant's intent and capacity.  If, so the Government should be entitled to examine the defendant using its own psychological expert and the Court should set a motion schedule, and not proceed with sentencing.

- <u>The Stash House Enhancement</u>.  The defendant stipulated to the applicability of the Stash House Enhancement.  However, the defense now argues that "there is no other evidence" that the defendant used his apartment to "distribute, store, or manufacture narcotics."  (Def. Br. 9).  If the defense seeks to advance such an argument in violation of the clear terms of the plea agreement, in which he stipulated to the applicability of the enhancement (including its factual basis), it would constitute a breach of that agreement.

- <u>The Minor Role Reduction</u>.  The stipulated Guidelines range agreed to by the defendant recognized that no role enhancement or reduction was applicable in this case.  Defense counsel suggests that a minor role would be "arguably applicable." (Def. Br. 11).  If defense counsel intends to seek such a reduction, in violation of the stipulation in the plea agreement that no such reduction was warranted, it would constitute a breach of the plea agreement.

---

[2] After entering a plea of guilty, a defendant has no "absolute right to withdraw [his] plea." *United States* v. *Karro*, 257 F.3d 112, 117 (2d Cir. 2001) (internal quotation marks omitted). This is so because a guilty plea is a "grave and solemn act," not to be entered or withdrawn lightly. *United States* v. *Hyde*, 520 U.S. 670, 677 (1997) (internal quotation marks omitted).  These principles are embodied in Rule 11(d) of the Federal Rules of Criminal Procedure. After the district court has accepted a defendant's guilty plea, Rule 11(d)(2) authorizes the withdrawal of a plea only if the defendant can show "a fair and just reason" for doing so.  This distinction reflects society's "strong interest in the finality of guilty pleas" that have been validly entered in court. *United States* v. *Maher*, 108 F.3d at 1529 (internal quotation marks omitted).

**Discussion**

I.   **The Defendant's Legal Arguments Run Contrary to Controlling Case Law and the Undisputed Facts**

   A.   **Binding Second Circuit Precedent Dictates that the Defendant Qualifies as a Career Offender**

Under Section 4B1.1(a) of the Guidelines, "[a] defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." There is no dispute that the defendant was over eighteen and that the instant offense is a controlled substance offense. The defendant disputes, however, the PSR's conclusion that he has two qualifying prior felony convictions.

Pursuant to the plea agreement, the parties did not stipulate to whether the defendant qualified as a career offender, carving out the ability for the defendant to argue that his prior convictions did not qualify. There is no dispute that the defendant was convicted, on June 11, 2010, of Attempted Assault in the Second Degree, a felony in violation of New York Penal Law Sections 110.0 and 120.05(2)—a crime of violence, and on December 17, 2014, of conspiracy to distribute crack cocaine in violation of Title 21, United States Code, Sections 846 and 841—a controlled substance offense. The Probation Department thus correctly determined that the defendant "is a Career Offender based on his convictions for Attempted Assault in the Second Degree, and Conspiracy to Distribute and Possess with Intent to Distribute Crack Cocaine." (PSR ¶ 51). This conclusion is compelled by binding Second Circuit precedent squarely addressing the import of these two convictions, and the defendant's futile attempt to persuade the Court to ignore governing law should be rejected.

   1.   **The Defendant's Attempted Assault Conviction Qualifies as a Crime of Violence**

As the defendant acknowledges, the Second Circuit squarely held in *United States* v. *Walker*, 442 F.3d 787, 788 (2d Cir. 2006), that where a defendant is convicted "under New York Penal Law § 120.05(2), . . . categorically, his conviction involved an attempt to cause physical injury by means of a deadly weapon or dangerous instrument. To (attempt to) cause physical injury by means of a deadly weapon or dangerous instrument is necessarily to (attempt to) use 'physical force,' on any reasonable interpretation of that term, and necessarily creates 'a serious potential risk of physical injury to another.'" Accordingly, it has been the law of this Circuit for more than a decade that "attempted assault under New York Penal Law § 120.05(2) is a 'violent felony.'"[3]

---

[3] The Second Circuit has been similarly clear that interpretations of "violent felony" under the Armed Career Criminal Act ("ACCA") are equally dispositive in interpreting the Guidelines term "crime of violence." *See, e.g., United States* v. *Reyes*, 691 F.3d 453, 458 n.1 (2d Cir. 2012).

The defendant relies on contortions of intervening case law to suggest that this plain holding has somehow been cast in doubt, but completely omits the fact that the Second Circuit has expressly rejected his arguments and has reaffirmed the holding of *Walker*, including as recently as last month. In *United States* v. *Rios*, No. 16-2882, 2017 WL 5952691, at *2 (2d Cir. Dec. 1, 2017), a case the defendant completely fails to mention, the Second Circuit expressly held that "*Walker* remains controlling law and dictates that a conviction under N.Y. Penal Law § 120.05(2) constitutes a 'crime of violence' under . . . the Guidelines." In reaching that holding, the Second Circuit rejected the defendant's "speculation about the definition of "physical force" employed by the *Walker* court"—the same speculation advanced here—noting that this argument is "belied by the plain text of the decision, which states that "[t]o ... cause physical injury by means of a deadly weapon or dangerous instrument is necessarily to ... use 'physical force,' on any reasonable interpretation of that term." 442 F.3d at 788; *see also United States* v. *Williams,* 526 F. App'x 29, 37 (2d Cir. 2013) ("We have previously determined that convictions pursuant to . . . [New York Penal Law Section] 120.05(2) (assault) qualify, categorically, as violent felonies under the Armed Career Criminal Act.").[4]

### 2. The Defendant's Narcotics Conspiracy Conviction Qualifies as a Controlled Substance Offense.

The Second Circuit has been equally unequivocal in reaching the obvious conclusion that a federal conviction for narcotics conspiracy qualifies as a controlled substance offense. In *United States* v. *Jackson*, 60 F.3d 128, 133 (2d Cir. 1995), the Second Circuit was explicit "that drug conspiracy convictions pursuant to 21 U.S.C. §§ 846 and 963 qualify as controlled substance offenses." In reaching that holding, the Circuit rejected the express argument advanced here by the defendant, concluding that "even though the broadened definition of 'controlled substance offenses' [to include conspiracies] articulated in the commentary does not appear in an actual guideline, it is binding authority." *Id.* at 131; *see also United States* v. *Nutter*, 61 F.3d 10, 13 (2d Cir. 1995) ("Our decision is controlled by *United States* v. *Jackson*, 60 F.3d 128 (2d Cir. 1995). In that case, we held that . . . a narcotics conspiracy conviction could be a predicate for a career criminal enhancement.").

In urging the Court to ignore these Second Circuit holdings and adopt the outlier view of the Tenth Circuit, *see United States* v. *Martinez-Cruz,* 836 F.3d 1305, 1314 (10th Cir. 2016)

---

[4] Instead of alerting the Court to this controlling law, the defendant instead urges the Court to adopt the flawed reasoning of a Connecticut district court in *Villanueva* v. *United States*, 191 F. Supp. 3d 178, 194 (D. Conn. 2016), analyzing an analogous Connecticut statute. That analysis cannot overcome the holdings of the Second Circuit, including *Rios*, which post-dates *Villanueva*. As another court in this district noted, in rejecting a similar plea, "With all due respect to the *Villanueva* Court, . . the Second Circuit itself has held since *2015 Johnson* . . . that assault is a "violent felony" under the "elements" or "force clause" of ACCA, and district courts in the Circuit have continued to apply Walker in the wake of *2015 Johnson*. In short, *Walker* remains binding on this Court and forecloses Rainey's argument that his assault conviction is no longer a 'crime of violence.'" *Rainey* v. *United States*, No. 14-CR-197 (JMF), 2017 WL 507294, at *2 (S.D.N.Y. Feb. 7, 2017) (collecting cases, internal citations omitted).

(acknowledging that holding "pits us against our sister circuits")[5], the defendant undermines the basic principle that the Court must follow *Jackson* "unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *United States* v. *Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (internal quotation marks omitted). That is, "[t]he precise question for this Court . . . is not whether, by its own analysis," subsequent Supreme Court cases call for a different result than that reached in *Jackson*. *United States* v. *Emmenegger*, 329 F. Supp. 2d 416, 429 (S.D.N.Y. 2004). Instead, it is whether that subsequent precedent "so conclusively supports that finding that the Second Circuit or the Supreme Court is all but certain to overrule" *Jackson*. *Id.* The defendant turns this rule on its head, arguing instead that "is a close enough call that again, any ambiguities should be resolved in favor of the defendant." (Def. Br. 59). That is not only flatly wrong, but it flies in the face of the obvious interpretation of the Guidelines. "[I]n the course of the application of the [S]entencing [G]uidelines, as in the application of any legal concept, the use of 'common sense' is more than just relevant, but required." *United States* v. *White*, 903 F.2d 457, 462 (7th Cir.1990). While the defendant's attempt to escape the obvious conclusion that a conviction for a conspiracy to distribute narcotics is a conviction of a controlled substance offense is creative, it is foreclosed by precedent and the requisite common sense.

Accordingly, the Second Circuit has squarely decided that convictions of the precise statutory violations the defendant has committed qualify for the career offender enhancement. There can thus be no serious legal dispute that the defendant qualifies as a career offender.

### B.     The Stash House Enhancement Applies

In his plea agreement, the defendant stipulated that a two level enhancement applied because the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance. The PSR similarly agreed that such an enhancement was applicable. (PSR ¶ 22). The defendant now disputes, as a factual matter, whether he did in fact operate a stash house, relying on the representations of counsel as to what the source of the drug paraphernalia found in his apartment might be, and on a speculative letter submitted by a neighbor. These provide no basis for disregarding the defendant's stipulation that the enhancement should apply. *See generally PPX Enters., Inc.* v. *Audiofidelity, Inc.*, 746 .2d 120, 123 (2d Cir. 1984) ("Under federal law, stipulations . . . are generally binding on the parties and the Court. Having agreed on a set of facts, the parties (who adopted the stipulation), and this Court, must be bound by them; we are not free to pick and choose at will." (internal citations omitted)); *United States ex rel. Reilly* v.

---

[5] *See, e.g. United States* v. *Rivera-Constantino*, 798 F.3d 900, 902 (9th Cir. 2015) (holding that a "prior conviction for conspiracy to possess marijuana with intent to distribute was a predicate drug trafficking offense"); *United States* v. *Rodriguez-Escareno*, 700 F.3d 751, 754 (5th Cir. 2012) ("We conclude that the Guidelines themselves, reasonably interpreted, provide that a conviction of the federal drug trafficking offense will qualify for the enhancement, and so will the federal crime of conspiring to commit such an offense."); *United States* v. *Sanbria-Bueno*, 549 F. App'x 434, 439 (6th Cir. 2013) ("The Commission expressly intended that a conviction under 21 U.S.C. § 846 for conspiracy to commit a federal drug offense proscribed by § 841 is a 'drug trafficking offense' as defined in the Guidelines.").

*New England Teamsters and Trucking Industry Pension Fund*, 737 F.2d 1274, 1278 (2d Cir. 1984) ("A party to a stipulation is not entitled to withdraw from the agreement unilaterally.").

In finding such bargained-for contracts as stipulations of fact binding, courts draw no distinction between civil and criminal cases, applying the above-described principles with equal vigor against criminal defendants. *See*, *e.g.*, *United States* v. *Eisen*, No. CR-90-00018, 1991 WL 180400, at *8 (E.D.N.Y. Sept. 3, 1991) (citing the Second Circuit's ruling in *PPX* to bind defendant to fact stipulation into which he entered during criminal trial); *cf. United States* v. *McKeon*, 738 F.2d 26, 28 (2d Cir. 1984). As one federal appellate court has put it: "[s]tipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions. *United States* v. *Technic Svcs., Inc.*, 314 F.3d 1031, 1045 (9th Cir. 2002). The primary purpose for entering into a stipulation is of course to "promot[e] judicial economy at the convenience of the parties." *United States* v. *Montgomery*, 620 F.2d 753, 757 (10th Cir. 1980) (citing J. Wigmore, *Evidence* §§ 2588-2597 (3d ed. 1940)). It has therefore been held that "stipulations between attorneys in open court or at trial cannot be disregarded or set aside at will." *Waller* v. *Kriss*, 217 B.R. 147, 153 (S.D.N.Y. 1998).

Nor is the defendant's factual argument availing. He seems to suggest that he is essentially the unluckiest man in the world—that despite living in an apartment in which law enforcement officers found scales, baggies, and a range of other tools of the drug trade in plain view (not hidden in some closet), and despite driving a vehicle in which a substantial quantity of narcotics were found, the defendant is just an innocent pawn who has no responsibility other than letting his cousin momentarily keep his drugs in his car. While that is certainly enough to support the defendant's conviction, the Court need not accept that allocution as the sole conduct in which the defendant engaged. Not only did he stipulate that he maintained a stash house, but the quantity of glassines, baggies, and other drug paraphernalia found in Tabb's apartment is consistent with, and indicative of, preparation and packaging of narcotics for distribution, (PSR ¶ 14), particularly when coupled with the defendant's possession of a quantity of narcotics packaged for distribution outside of the stash house.

### C.  The Defendant is Not Entitled to a Minor Role Reduction

The defendant bears that burden to "prove by a preponderance of the evidence that [h]e is entitled to a minor role adjustment under § 3B1.2 of the Sentencing Guidelines." *United States* v. *Castano*, 234 F.3d 111, 113 (2d Cir. 2000). Here, not only has the defendant not met that burden, he has stipulated that no such adjustment is appropriate.

Even had he not, none would be warranted. "Whether a defendant may be accorded the benefit of a 'minor' or 'minimal' role adjustment under § 3B1.2 does not turn solely upon his status or his assigned task in the criminal enterprise….[T]his determination is to be made not with regard to status in the abstract but rather with regard to the defendant's culpability in the context of the facts of the case." *United States* v. *Garcia*, 920 F.2d 153, 155 (2d Cir. 1990). Nor is the court limited solely to the facts of the defendant's limited allocution. The PSR, as to which the defendant raised no factual objections, recited the defendant's more substantial role. The 911 caller reported that the black male with the firearm who had fired shots in the vicinity of 217th Street was the driver of the Vehicle, and the defendant was found driving the Vehicle only a short time later. (PSR ¶¶ 9-10). Not only did officers recover narcotics from the Vehicle (which

was registered to the defendant's girlfriend) (*Id*. ¶¶ 10-11), they also found numerous items of narcotics paraphernalia, including plastic baggies, wax paper "glassine" baggies, and several scales in plain view within the apartment. Various of these items subsequently tested positive for narcotics residue, including cocaine and heroin. (*Id*. ¶ 13). In short, the defendant resided in what he has stipulated was a stash house used for the preparation of narcotics—an apartment he shared with his girlfriend, he was found in a Vehicle registered to the same girlfriend where narcotics were also recovered, and that same Vehicle had been identified as being involved in a shooting only a short time before. This amply proves that the defendant cannot carry his burden of proving that a minor role adjustment would be appropriate.

## IV. The Appropriate Sentence

### A. Applicable Law

The Guidelines continue to provide important guidance to district courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). While *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must consult the Guidelines and take them into account when sentencing. 543 U.S. at 264. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the applicable Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Court Should Impose a Sentence Within the Applicable Guidelines Range

The defendant's efforts to minimize the scope of his criminal conduct here, by asserting that he was a mere aider and abettor, is a naked attempt to evade just punishment for his offense, and calls into doubt the seriousness of his protestations of remorse. On the contrary, his refusal to accept responsibility in anything more than the most technical sense strongly supports the conclusion that the defendant not only requires additional deterrence, but also that the Court should impose a sentence of sufficient severity to demonstrate to the defendant and the community the seriousness of his offense.

As noted above, the defendant was not only found driving a vehicle registered to his girlfriend that contained narcotics packaged for distribution, he was also residing in what he has stipulated was a stash house, where extensive narcotics paraphernalia was found in plain view. Not only did he commit these offenses, he did so while on supervised release from a prior federal narcotics conviction, demonstrating that his earlier sentence of three years' imprisonment—itself a substantial discount from his Guidelines range of 100 to 125 months' imprisonment (PSR ¶48), did nothing to deter the defendant from returning to his pattern of narcotics crimes. Indeed, he committed the instant offense less than a year after being released from jail, and while still on supervised release.

Moreover, the defendant is a career offender by any qualitative definition of that term, even apart from the legal standards that warrant his designation as a career offender under the Guidelines. The defendant has had ten criminal convictions since turning 18. A substantial number of those convictions of involved not only actual or potential violence, but also drug activity. In 2005, 2010, and 2014 the defendant has been convicted of crimes involving firearms, including his 2010 assault conviction stemming from actually shooting the firearm at another individual. (PSR ¶44). Here too, the defendant's arrest arose from an investigation of the driver of the Vehicle for shooting a firearm in the Bronx; the defendant was found driving the Vehicle only a short time later. Similarly, in 2015, the defendant was convicted of grand larceny after assaulting a woman in order to steal her phone and purse. (PSR ¶47). The defendant also has convictions in 2005, 2007, 2012, 2014, and 2015 for offenses involving narcotics.

By contrast to his career as a criminal, the defendant reported only approximately four months of gainful employment in 2015. The defendant has no plan, and apparently no desire, to be a productive member of society—he could not avoid his pattern of dangerous criminal behavior even while under the direct supervision of the Probation Department stemming from his prior conviction.

The defendant's principal argument that he has the capacity to lead a law-abiding life stems from his intention to return to a purportedly stable environment living with his girlfriend. Not only was this the same environment the defendant was in when he committed the instant offense, it was that apartment that the defendant has stipulated was a stash house, and where a large quantity narcotics paraphernalia were found in plain view. Similarly, it was the defendant's girlfriend's vehicle that the defendant was driving in the vicinity of a shooting and that contained the narcotics for which he is presently pleading guilty. The defendant's intention

to return to this allegedly supportive environment is just an admission that he intends to return to precisely the life he was leading before the instant arrest.

These factors all strongly support a sentence within the career offender Guidelines range. Not only is the defendant's offense a serious one, this defendant clearly requires additional deterrence, and the community needs to be protected from him. Supervised release was not sufficient to protect the community from the defendant's crimes before, when he received a substantially discounted sentence. Nor have his prior terms of incarceration deterred him from returning, again and again, to crimes involving violence, firearms, and narcotics. His plea for leniency is premised on an understatement of his offense conduct, and a reentry plan that simply calls for him to return to the life he was leading before his arrest. To adequately reflect the seriousness of the defendant's offense—including by demonstrating its seriousness to him, which he clearly has not grasped, to deter him from once again simply returning to his career of crime, and to protect the community from the defendant's pattern of violent, drug-dealing activity, nothing less than a sentence within the career offender Guidelines range would be sufficient.

## Conclusion

For the reasons set forth above, the Government respectfully submits that the Court should sentence the defendant to terms of imprisonment within the applicable Guidelines range of 151 to 188 months' imprisonment, as such a sentence is sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:     /s/
    David W. Denton, Jr. / Rebekah Donaleski
    Assistant United States Attorneys
    (212) 637-2744/2423

Cc:    Richard Signorelli, Esq.